UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
GEORGE H. BARLOW JR.,

                     Plaintiffs,                     **MEMORANDUM AND ORDER**

               - v -                                        08-CV-4436 (VVP)

LIBERTY MARITIME CORP., ET AL,

                     Defendants.
----------------------------------------------------------------x

POHORELSKY, Magistrate Judge:

      After a jury trial in this maritime case, the plaintiff George H. Barlow Jr. has renewed his motion pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law and has moved alternatively under Federal Rule of Civil Procedure 59 for a new trial. The plaintiff's present motion is focused primarily on the court's rulings on two issues raised during the trial. The first issue, related to the contributory negligence inquiry, is whether the plaintiff was engaged in a "rescue" under the maritime rescue doctrine at the time he was injured aboard the defendant's vessel. And the second is whether the parting of two of the ship's mooring lines either shifted the burden of proof to the defendants or merited judgment as a matter of law for the plaintiff on his claim that the vessel was unseaworthy. For the reasons that follow, the court finds no errors in the challenged rulings and the plaintiff's motion is denied in its entirety.

### BACKGROUND AND PROCEDURAL HISTORY

      The plaintiff was injured while serving as a merchant seaman on the commercial vessel The Liberty Sun and brought suit against the vessel and its owners for negligence under the Jones Act, 46 U.S.C. § 30104, and for unseaworthiness under general maritime law. With the

consent of the parties, I presided over a jury trial on the plaintiff's claims. The evidence before the jury was as follows.[1]

George Barlow has been working on ships from a young age and holds a captain's license. Barlow began work on The Liberty Sun as third mate in 2007. The Liberty Sun is a large vessel and in May of 2007 it was commissioned to load grain from the Hermosa Terminal ("the terminal"), a floating grain elevator on the Amazon River. During the time the ship was stationed there, the current on the Amazon was strong. In order to keep the ship in place at the loading site, the vessel was "moored" (or tied) by eight shipping lines to the terminal's mooring buoys around the ship as well as to the shore. The terminal's lines were "married" (*i.e.*, attached) to the lines of The Liberty Sun and rolled onto the spools (also called "drums") of the winches of The Liberty Sun. There were also two tugboats stationed alongside the ship to prevent it from moving out of place and hitting the terminal. One morning a few days into the project, two of the mooring lines that were securing the vessel to the terminal parted – that is, they broke so that they were no longer serving to secure the vessel.

The second mate Schloemer was on duty as officer of the watch at the time. When the first line parted, Schloemer informed the ship's captain, Donald Grosse, that the line had broken and that one of the tugboats was pushing against the ship. The captain instructed the second mate to assemble the deck crew to replace the line that had broken. The second mate complied and asked the bosun to keep an eye on the remaining lines to monitor whether they were in danger of breaking.

After speaking to Schloemer, the captain made a public announcement for all of the crew to go to the bow. He also called the chief engineer and instructed him to turn on the engines and

---

[1] The trial took place over the course of six days, November 14, 2011 – November 18, 2011 and November 21, 2011. The transcripts of the proceedings are found at Dkt Nos. 76, 74, 75, 77, 78 and 60. "Tr." refers to the trial transcripts found in these docket entries.

move the ship forward in order to ease the tension on the lines. After the second line parted, the captain spoke to the mooring master and told him to replace the second line as well.

Barlow was off-duty and asleep when the first line parted, but was awakened by the sound of the emergency alarm. He went up to the bow and saw Schloemer supervising the putting out of new lines to replace the ones that had parted. He approached Schloemer and told him that the actions they were taking were not going to remedy the situation. Schloemer replied that he was in charge and that Barlow should stand back and not take any action.

After being rebuffed by Schloemer, Barlow attempted to call the captain but could not reach him. Barlow then approached two other crewmembers and they discussed slackening the remaining lines to ease the tension on them. Barlow then went to a winch that was holding one of the remaining lines and attempted to loosen the line. He did so by bumping the brake handle counter-clockwise. Instead of slackening only slightly, the line paid out very rapidly, and a portion of the line struck Barlow in his inner thigh and groin, causing deep tissue injuries that ultimately required a skin graft. At some point during these events, the vessel was secured. Barlow was treated on shore for his injuries. After the incident as part of standard company policy, the captain prepared an investigative report describing the incident and its root causes and this document was received in evidence ("the Corrective Action Report").

In the closing argument, the plaintiff argued to the jury that the vessel The Liberty Sun was responsible for the plaintiff's injuries because the ship's lines were not properly monitored and secured, and that Barlow's injuries were caused by these conditions on the ship. He also argued that Barlow's attempt to slacken the lines was done properly under the circumstances. The defendants argued that the evidence did not support these conclusions and that Barlow's injuries were solely caused by his own negligence. They argued that he was injured because he failed to follow the chain of command by disobeying the instructions of the second mate and did

not properly engage the winch. In the alternative, they argued that even if the defendants were at fault, any damage award should be reduced to reflect Barlow's contributory negligence.

The jury found that the vessel The Liberty Sun was seaworthy and thus found against the plaintiff on that claim. As to the negligence claim, the jury found that both the plaintiff and the defendants were negligent and that the negligence of both contributed to the plaintiff's injuries. The jury apportioned fault, attributing 90% of fault to the plaintiff and 10% of fault to the defendants. The jury found that the plaintiff's damages totaled $446,000. Jury Verdict, Dkt. No. 58.

The plaintiff timely moved before this court for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Federal Rule of Civil Procedure 59(a), citing objections to the court's rulings on his motion for a directed verdict on the contributory negligence and seaworthiness claims, and on his requests to alter the contributory negligence and seaworthiness instructions to the jury.[2]

## DISCUSSION

### I. Standards of Law

Motions for judgment as a matter of law under Rule 50 are governed by the same standards as those that govern motions for summary judgment. *See, e.g., This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998). Thus, under Rule 50(a), "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As on summary judgment, the trial judge must draw all reasonable inferences, and resolve all credibility assessments, in favor of the non-moving party. *See Cross v. New York City Transit Authority*, 417 F.3d 241, 247 (2d Cir. 2005). The court may not itself weigh the credibility of witnesses or consider the weight of the

---

[2] The plaintiff's motion also included objections to in limine rulings as to the testimony of defendant witness Alan Colletti and other witness statements, but the plaintiff withdrew this aspect of his motion in his reply memorandum. *See* Plaintiff's Reply Memorandum, Dkt No. 72, at 10.

evidence. *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000). Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it. *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

The standards for granting a Rule 59 motion for a new trial are less stringent than those applicable to motions under Rule 50. Thus, the trial judge may weigh the evidence himself without viewing it in the light most favorable to the non-movant, and the motion may be granted even if substantial evidence may support the jury's verdict. *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *DLC Mgt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir.1998). A new trial may be granted if the court committed error in its jury instructions, but the court should grant a new trial only if it is convinced that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988); *see also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Munafo v. Metropolitan Transp. Authority*, 381 F.3d 99, 105 (2d Cir. 2004).

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (quoting *LNC Invest., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 460 (2d Cir. 1999)). The Second Circuit has stated that it "will not upset a judgment on the basis of jury instructions 'if the charge actually given was correct and sufficiently covered the essential issues,'" *Densberger v. United Technologies Corp.*, 297 F.3d 66, 73 (2d Cir. 2002) (quoting *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d

Cir.1993)). Indeed, "a trial court has considerable discretion in the formulation and style of jury instructions," and "a new trial is only warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *Patalano v. American President Lines*, 250 Fed. Appx. 425, 427-28, 2007 WL 2974002 (2d Cir. 2007) (citing *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106 (2d Cir. 2001) and *Plagianos v. American Airlines*, 912 F.2d 57, 59 (2d Cir. 1990)). Moreover, a new trial is not warranted if the error is harmless. *Boyce*, 464 F.3d at 390.

## II. Contributory Negligence

On the present motion, the plaintiff argues that the court erred in its contributory negligence instruction to the jury and that even if did not, the jury's apportionment of fault was against the great weight of the evidence. As discussed below, the court finds that the jury was properly instructed on the law and that the jury's verdict was reasonable.

### A. The Proposed Rescue Instruction

In his proposed jury instructions, the plaintiff requested the court to modify the traditional contributory negligence instruction to incorporate the "rescue doctrine." Under the plaintiff's proposal, the jury would have been instructed that Barlow could only be found contributorily negligent if he "(a) acted wantonly or recklessly in his perception of the need for a rescue and; (b) acted wantonly or recklessly in responding to the perceived rescue." *See* Plaintiff's Proposed Jury Instructions, Dkt. No. 49, at 4-5. The plaintiff's proposed instruction relied on the Fourth Circuit's decisions in *Furka v. Great Lakes Dredge & Dock Co., Inc.*, 755 F.2d 1085 (4th Cir. 1985) (*Furka I*), and 824 F.2d 330 (4th Cir. 1987) (*Furka II*) and modified the traditional contributory negligence instruction found in Judge Leonard Sand's treatise, 5 Leonard B. Sand, Modern Federal Jury Instructions—Civil ¶ 90.03, Instrs. 90-26 – 90-28.

According to the plaintiff's theory of rescue, once the two lines parted, there was additional strain put on the remaining lines and if Barlow did not act immediately, those

additional lines could have parted and injured or killed a crewmember on the bow. The court declined to give the rescue doctrine instruction because there was no evidence that there was immediate danger to life or property at the time that Barlow acted. The court recognized, however, that there was testimony presented by both sides that there was an emergency. Drawing from the New York Pattern Jury Instructions, the court therefore instructed the jury to consider whether Barlow was faced with an emergency when evaluating contributory negligence. *See* N.Y. Pattern Jury Instr. Civil 2:14 (3d ed.). This charge incorporated a "reasonably prudent seaman" standard, not the lower standard of care advocated by the plaintiff.[3]

The plaintiff now argues that the court should have instructed the jury on the rescue doctrine because the evidence presented to the jury demonstrates that Barlow was acting to save the lives of the personnel on the bow when he attempted to operate the winch.[4] As discussed

---

[3] The court thus instructed the jury as follows:

> A person faced with an emergency and who acts without opportunity to consider the alternatives is not negligent if he acts as a reasonably prudent person would act in the same emergency, even if it later appears that he did not make the safest choice or exercise the best judgment. A mistake in judgment or wrong choice of action is not negligence if the person is required to act quickly because of danger. This rule applies where a person is faced with a sudden condition which could not have been reasonably anticipated, provided that the person did not cause or contribute to the emergency by his own negligence.
>
> If you find that the plaintiff was faced with an emergency and that his response to the emergency was that of a reasonably prudent seaman, then you will conclude that the plaintiff was not negligent. If, however, you find that the situation facing the plaintiff was not sudden or should reasonably have been foreseen, or was created or contributed to by the plaintiff's own negligence, or that the plaintiff's conduct in response to the emergency was not of that a reasonable seaman, then you may find that the plaintiff was negligent.

Tr. 1351:22-1352:17 (Jury Charge).

[4] The plaintiff also states that Barlow was attempting to rescue the vessel itself, but he points to no evidence in the record of what the danger to the vessel was – at the time Barlow acted, six of the eight mooring lines holding the ship were in place, two tugboats were acting to keep the ship secure, and the crew was turning on the engines. Thus, although the rescue doctrine can apply to property, *Christensen v. Georgia Pacific Corp.*, 279 F.3d 807, 816 (9th Cir. 2002), the absence of any evidence in support of this

further below, the court's refusal to instruct the jury on the rescue doctrine set forth in *Furka* was not erroneous for two reasons: first, the plaintiff failed to adduce any non-speculative evidence in support of his theory that he was engaged in a rescue when he was injured, *i.e.*, that he was acting to save lives that were in imminent danger; and second, even if there was evidence of an imminent danger to human life or property, no clear authority required a jury instruction that the plaintiff's comparative fault be judged by a "wanton or reckless" standard.

### i. The Rescue Doctrine Did Not Apply to the Plaintiff's Actions

The maritime rescue doctrine is rooted in a desire in the law of admiralty to "'encourage and induce men of the sea to go to the aid of life and property in distress.'" *Berg v. Chevron U.S.A., Inc.*, 759 F.2d 1425, 1429 (9th Cir. 1985). Derived from the law of salvage, the "maritime rescue doctrine has developed as an encouragement to life saving attempts." *Id. See also Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021 (5th Cir. 1969). The development of the doctrine has been uneven. In the early cases, a traditional negligence standard was applied when evaluating the contributory negligence of a seaman who was injured when responding to a life-threatening event. *See Berg*, 759 F.2d at 1429 (citing *Hutchinson v. Dickie*, 162 F.2d 103, 106 (6th Cir. 1947), *cert. denied*, 332 U.S. 830 (1947) and *Harris v. Pennsylvania Railroad Co.*, 50 F.2d 866, 869 (4th Cir. 1931)). In more recent decisions, however, some federal appeals courts faced with a plaintiff who was acting to rescue life have applied a less demanding standard of care to rescuers. Thus, the Fifth Circuit adopted the standard that a would-be rescuer is contributorily negligent if he "through want of due care, has worsened the position of the victim." *Grigsby*, 412 F.2d at 1021. In *Furka*, the Fourth Circuit took a somewhat different approach and adopted a wanton or reckless standard for evaluating contributory negligence during rescue attempts. According to the Fourth Circuit, the jury should

---

theory demonstrates that the plaintiff was not entitled to a rescue doctrine instruction based on an attempt to save property.

be instructed to decide whether the plaintiff was reckless or wanton in perceiving the need for a rescue, and if not, whether his conduct in attempting the rescue was reckless or wanton. *Furka II*, 824 F.2d at 330-32. The Ninth Circuit has relied on both standards, stating that "a rescuer will be held liable only (1) for negligent conduct that worsens the position of the victim or (2) for reckless and wanton conduct in performing the rescue." *Berg*, 759 F.2d at 1430. The Second Circuit has not directly addressed the issue.

The above cases address the standard of care in rescue situations, but provide little direct guidance as to when a jury should be instructed about the "rescue" doctrine. A court need not give every instruction requested by a party; rather a requested jury instruction need be given only if there is "some evidence supporting the theory behind the instruction." *Folmsbee v. Metro-North Commuter Railroad Co.*, No. 11-CV-1972, 2012 WL 3832491, at *1 (2d Cir. Sept. 5, 2012) (quoting *Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010)). Generally speaking, the rescue doctrine requires evidence of an imminent threat of harm. Thus, the Fourth Circuit stated in a non-maritime case that "the rescue doctrine . . . allows a plaintiff to recover when he has placed himself in danger in order to protect others from 'apparent immediate peril of death or serious bodily harm.' . . . The circumstances must be sufficiently dire 'as to induce a reasonable belief that some person is in imminent peril.'" *Greene v. Consolidated Freightways Corp. of Delaware*, 2 Fed. Appx. 299, 301 (4th Cir. 2001) (quoting *Commonwealth v. Millsaps*, 232 Va. 502, 352 S.E.2d 311, 313-14 (Va. 1987)). An examination of the cases cited by the plaintiff discloses that the danger to life in those cases was far more pronounced and imminent than what the court was presented with here. For example, in *Furka* the would-be rescuer who drowned was attempting to save a seaman whose boat was adrift and who was reported to be freezing to death. *See Furka I*, 755 F.2d at 1087. In *Berg*, 759 F.2d at 1430, the rescue involved a crew whose ship was capsizing and who were believed to be trapped in the wheelhouse. *See also The Noah's Ark v. Bentley & Felton Corp.*, 292 F.2d 437, 439-40 (5th Cir. 1961) (rescue

involving ship whose engines were filling with sea water and melting ice and was left adrift after several lines parted); *DFDS Seacruises v. United States*, 676 F. Supp. 1193, 1200-01 (S.D. Fla. 1987) (rescue where fire aboard a ship threatened both vessel and human life). As discussed below, there was insufficient evidence to put the *Furka* rescue doctrine inquiry before the jury in this case.

In contrast, the evidence of any imminent danger to human life due to potential parting of additional lines was speculative. The witnesses all agreed that if a line under tension parts, it could snap back and kill someone, and there was no dispute that the parting of two lines put additional strain on the remaining six lines. But the only witness that testified that he believed the remaining lines were in imminent danger of parting and injuring the crew was Barlow. *See, e.g.*, Tr. 258:1-9 (Barlow). The plaintiff's testimony as to his subjective belief, although perhaps genuinely held, was insufficient to present the issue to the jury. At the time Barlow took action, no one had been injured and the vessel was under control. He had just been ordered to stand down, and defying the chain of command presents dangers of its own. Tr. 1077:10-15 (Captain Hall); *see Thames Shipyard and Repair Co. v. United States*, 350 F.3d 247, 276 (1st Cir. 2003) ("The exigencies and realities of life at sea require that there be a rigid chain of command aboard a ship.") Indeed, Captain Grosse testified that taking any action in contravention of his orders would have exacerbated the emergency. Tr. 568:17-569:8. Further, Barlow knew that by his superior's order there was action being taken by the crew aimed at relieving any danger of imminent parting of additional lines. The lines were being monitored closely and new lines were being put out. The running of the ship's engines was also easing the tension on the lines. Tr. 475:9-16 (second mate Schloemer); Tr. 556:22-557:16 (Captain Grosse). Simply put, there was insufficient evidence that the crew was in imminent peril.

Because the testimony regarding the danger to life was speculative, a jury instruction on the rescue doctrine would have unnecessarily confused the jury. The jury was consistently

presented with testimony by the plaintiff and others that described an emergency situation that if not handled, could at some point become more serious. Two of the eight lines securing the ship had parted and the crew of The Liberty Sun had to act quickly in order to prevent any number of possible scenarios, one of which was the parting of additional lines. Recognizing that there was evidence that there was an emergency aboard the ship, the court instructed the jury that if it found that Barlow was responding to an emergency, they could factor this into their contributory negligence inquiry. Although this charge did not use the "wanton or reckless" standard favored by the plaintiff, it sufficiently informed the jury to consider the circumstances faced by the plaintiff when he acted.

Finally, even if the evidence was sufficient to have required the jury to determine whether the plaintiff was involved in a "rescue," there is no authority in this Circuit that the court's instruction on the standard of care to be applied in an emergency is any different from that to be applied in a rescue. Like the emergency doctrine instruction given here, the plaintiff's proposed rescue doctrine instruction stated that "[w]hen confronted with an emergency, a rescuer should not be charged with the consequences of errors of judgment resulting from the excitement and confusion of the moment." Plaintiff's Proposed Jury Instructions, Dkt. No. 49, at 5. The only material difference between the instruction given by the court and the one proposed by the plaintiff is that the plaintiff's instruction gives the would-be rescuer the benefit of a standard of care – "wanton or reckless" – which is somewhat lower than that of a "reasonably prudent person" facing the same emergency. The plaintiff has cited no authority, however, to establish that the "wanton or reckless" standard applies in rescue cases in this Circuit. The authority in this Circuit has generally applied a reasonable person standard. For instance, in *Badalamenti v. United States*, 160 F.2d 422 (2d Cir. 1947), two longshoremen were injured when one fell into a hatch on the deck and the second one fell in as well when he went to look for his crewmate. In discussing the second crewmember's contributory negligence, the court noted that even if he

-11-

apprehended danger to himself or his crewmate, his actions were not "*unreasonable or negligent* to disregard a somewhat strained caution when going to find a fellow-workman who had disappeared." *Id.* at 426 (emphasis added). Later, in *Nye v. A/S D/S Svendborg*, the Second Circuit affirmed a lower court decision that found that a ship's crew's actions were "*reasonably proper*" in emergency conditions requiring rescue of life. *See Nye v. A/S D/S Svendborg*, 358 F. Supp. 145, 152 (S.D.N.Y. 1973) (emphasis added), *aff'd* 501 F.2d 376, 380-81 (2d Cir. 1974). *Cf. The Cape Race*, 18 F.2d 79, 81 (2d Cir. 1927) (in salvage case holding that "every salvor is bound to the exercise of ordinary skill and diligence"); *Serviss v. Ferguson*, 84 F. 202, 203 (2d Cir. 1897) (per curiam) (same). Thus, in light of this authority and considering the limited evidence of the plaintiff's perceived need for rescue, the instruction concerning contributory negligence in an emergency properly instructed the jury on the law to be applied to this case.

### ii. The Emergency Charge Did Not Prejudice the Plaintiff

The plaintiff also makes several arguments as to why the emergency instruction itself was unwarranted. The court notes first that while the plaintiff took exception to the emergency doctrine as an alternative to its rescue doctrine charge, he never argued that he preferred the traditional contributory negligence charge should the court decline to instruct the jury on the rescue doctrine. He now argues that the emergency doctrine was improper because it applies to sudden, unexpected, and unforeseen events where an individual has little time to think and that on the contrary, Barlow acted deliberately, drawing upon his prior experience as a seaman. The plaintiff argues that it was erroneous to charge the jury that he made a "wrong choice" or "mistake in judgment" referred to in the PJI 2:14 charge. This argument is convoluted and completely contrary to Barlow's testimony that he acted in contravention of orders because he believed this to be an emergency. The argument also makes no sense since the plaintiff's proposed rescue charge also would have instructed the jury not to charge the plaintiff with "consequences of errors of judgment resulting from the excitement and confusion of the

moment." Plaintiff's Proposed Jury Instructions, Dkt No. 49, at 4-5. Finally, like the rescue doctrine, the emergency doctrine does not assume that the plaintiff made a wrong decision – it instructs the jury that it should take the emergency situation into account when it decides whether the plaintiff was acting as a reasonably prudent seaman *in the circumstances*. This instruction only helped the plaintiff's case.

The plaintiff also argues that the rescue doctrine is a federal maritime charge and that "maritime uniformity" requires the court to use the reckless or wanton standard in those cases rather than the "state emergency charge." This argument is simply contrived. Where no federal statute or well-established rule of admiralty exists, admiralty law may look to common law or state law. *See Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998); *Szollosy v. Hyatt Corp.*, 208 F. Supp. 2d 205, 214 (D. Conn. 2002). The plaintiff is right that if there had been sufficient evidence of a rescue, a maritime rescue doctrine charge would have been proper. But, as discussed above, there was not, leaving either the standard contributory negligence charge or a modification of it based on the circumstances of the case. The plaintiff has not cited any meaningful authority for rejecting the emergency doctrine in a non-rescue emergency situation in maritime cases. The only material difference between the emergency charge and the standard Jones Act contributory negligence charge is the instruction that the jury take into consideration whether the plaintiff was responding to an emergency in assessing whether he acted reasonably. This was only to the plaintiff's benefit.[5]

### B. The Jury's Apportionment of Fault

The plaintiff argues that the jury's allocation of 90% fault to Barlow was "against the great weight of the evidence," but does not support this contention with any citations to the

---

[5] The plaintiff's other general stab at the emergency doctrine is an argument that it is no longer a viable concept, relying on *Caristo v. Sanzone*, 96 N.Y.2d 172, 750 N.E.2d 36 (2001). Although the *Caristo* decision recognized that some jurisdictions have questioned the doctrine, the court did not reject its applicability in New York. It went on to explain the proper application of the doctrine. *Id.* at 174-75.

record or to case law. The extent of the plaintiff's own negligence and the extent to which it was the cause of his injuries was the focus of the defendants' case. There was extensive testimony that Barlow caused a line of the winch to spin out rapidly and strike him because he failed to put the winch into gear before operating it. The defendants' experts testified that the only safe way of easing tension on a line is to engage the winch first. *See* Tr. 740:12-19 (Colletti). By releasing the brake without first engaging the winch, they testified, Barlow caused the drum to spin out rapidly in his direction, which caused his injury. Tr. 741:12-742:3 (Colletti); Tr. 1071:12-1072:23, 1075:2-1076:8 (Captain Hall). The jury watched a video recording that demonstrated the relative ease with which the winch could be engaged. Tr. 1045:11-13, 1054:22-1055:1 (Barlow); 1075:14-1076:5 (Captain Hall). Barlow himself acknowledged that failing to engage the winch before releasing the brake caused an already tense line with great stored energy to pay out rapidly. Tr. 263:16-264:23 (Barlow). A reasonable view of this evidence is that the plaintiff's failure to follow the chain of command and his decision to take matters into his own hands by operating the winch in stressful conditions was a substantial cause of his injuries. The court finds no basis therefore to set aside the jury's apportionment of fault.

### III. Unseaworthiness Claim

The doctrine of unseaworthiness imposes an absolute, non-delegable duty on a shipowner to provide a vessel, as well as equipment, appurtenances and crew that are reasonably suited for their intended purpose. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498-500 (1971); *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). "[U]nseaworthiness is a condition, and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." *Usner*, 400 U.S. at 498. The burden of proving unseaworthiness is on the plaintiff to show by a preponderance of the evidence that the ship, its equipment or crew, was unseaworthy. *See In re Marine Sulphur Queen*, 460 F.2d 89, 99 (2d Cir. 1972); *Sadler v. Moran Towing Corp.*, 204 F. Supp. 2d 695, 696

(S.D.N.Y. 2002); *Saleh v. United States*, 849 F. Supp. 886, 893-94 (S.D.N.Y. 1994) (citing *Mitchell*, 362 U.S. at 550). In this post-trial motion, the plaintiff renews his motion for judgment as a matter of law on his unseaworthiness claim and also renews challenges to the court's instructions to the jury. As discussed below, the plaintiff's arguments are without merit.

### A. The Parting of the Lines

The plaintiff argues that the court should have granted his motion for a directed verdict on his unseaworthiness claim or in the alternative that the court erred in its unseaworthiness instruction because the parting of the two mooring lines in this case raised a presumption of unseaworthiness that shifted the burden of proof to the defendants. The plaintiff's motion is denied because the case law does not support his argument. Moreover, the defendants here presented evidence to demonstrate that the lines parted for reasons other than any unseaworthy condition of the vessel. The jury was entitled to, and did, decide this factual question.

During trial, the plaintiff raised this issue first in his motion for a directed verdict, relying on the Second Circuit's decision in *Martinez v. United States*, 705 F.2d 658 (2d Cir. 1983). There, the court held that [a] vessel whose mooring lines part in a rapid but not extraordinary current was unseaworthy as a matter of law," and that the vessel had failed to establish that the lines parted due to an "inevitable accident" or *vis major*. *Id.* at 660-62. The court found *Martinez* inapplicable to the facts of the plaintiff's case. In *Martinez*, all of the ship's lines parted whereas only two of The Liberty Sun's mooring lines parted before the crew was able to stabilize the situation. And indeed, the *Martinez* rule regarding a "presumption of unseaworthiness" has since been applied in circumstances where a ship breaks away completely. *See Crowley v. Costa*, No. 09-CV-1991, 2011 WL 5593112, at *4 (D. Conn. Nov. 17, 2011) ("In *The Louisiana*, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85 (1865), the Supreme Court established that a moored vessel that breaks away and allides with a stationary object is presumed to be at fault unless it can show that the drifting was the result of a *vis major* or inevitable accident, which 'a

proper display of nautical skill could not have prevented.'") (quoting *Martinez*, 705 F.2d at 661); *Matter of Palmer Johnson Savannah, Inc.*, 1 F. Supp. 2d 1377, 1383 (S.D. Ga. 1997) (in case where ship broke free of all of its mooring lines, the court applied rule that "[w]hen a ship breaks loose from its moorings, a presumption of unseaworthiness is created which the shipowner is required to overcome") (citing *Martinez*, 705 F.2d at 662).

Although the plaintiff cites cases where the parting of a single line was accompanied by a finding of unseaworthiness, none of these courts shifted the burden of proof to the defendant on the unseaworthiness inquiry or found a vessel unseaworthy as a matter of law in circumstances like the one before the court. Rather, in each instance, the fact finder made a decision, based on the evidence before it that a defect in the line or rope that caused the plaintiff's injury rendered the vessel unseaworthy. Part of that finding, surely, was that the parting of the line was evidence that it was not properly suited for its intended purpose – but these courts did not hold that in all circumstances the parting alone demonstrated this as a matter of law without further inquiry. In *Mahnich v. Southern S. S. Co.*, 321 U.S. 96 (1944), the plaintiff was injured by a fall from a staging that gave way when a piece of rope supporting the staging parted. There was evidence that the rope was rotten and it was on this basis that the court found that the ship was unseaworthy – regardless of any crew member's negligence. *Id.* at 97, 103. The court stated, "[t]he staging from which petitioner fell was an appliance appurtenant to the ship. It was unseaworthy in the sense that it was inadequate for the purpose for which it was ordinarily used, because of the defective rope with which it was rigged. Its inadequacy rendered it unseaworthy, whether the mate's failure to observe the defect was negligent or unavoidable." *Id.* at 103. *See also Nitkowski v. Prudential-Grace Lines, Inc.*, 469 F.2d 93 (9th Cir. 1972) (trial judge's finding that ship was unseaworthy because a line parted when the plaintiff put his foot on it to test its tension was not clearly erroneous); *Ward v. American Hawaii Cruises, Inc.*, 719 F. Supp. 915, 915-19, 921 (D. Hawaii 1988) (after bench trial, fact finder held that circumstances demonstrated

that mooring line was in an unseaworthy condition, including that the lines were greased, which can damage lines); *T.J. Stevenson & Co., Inc. v. George W. Shiteman Towing, Inc.*, 331 F. Supp. 1038, 1040-41 (E.D. La. 1970) (after bench trial, trial judge made finding of fact that the line "broke only because it was defective and not fit for its intended use" and cited testimony that the line was found "frayed and rotted").

In *Cook v. American S.S. Co.*, 53 F.3d 733, 737, 70-42 (6th Cir. 1995), *appeal after new trial*, 205 F.3d 1339 (6th Cir. 2000), the court held that the vessel was unseaworthy as a matter of law where a burned line that was supporting plaintiff in a bosun's chair parted and he fell to the dock. This holding, however, was not made in a vacuum – there was no evidence that the line parted due to any circumstances outside of the ship or its crew's control. In fact, the only evidence before the jury as to the cause of the line parting was that the line had been burned in preparation for its use. There was also some evidence that this burning may have contributed to the line parting. That the use of a burned line in *Cook* demonstrated that a ship was unseaworthy as a matter of law does little to inform the present case.[6]

Here, on the other hand, there was evidence before the jury that allowed it to find that the failure of the two mooring lines was not the result of any defective condition in the lines or on the ship. One of the defendants' theories was that a sudden, unexpected surge of power from one of the tugs that was assisting the vessel to stay in position caused the first line to part. While the plaintiff questions the credibility of this theory, it is not wholly unsupported by the evidence. The defendants' expert testified that the fact that a crewmember observed black smoke coming out of the tug indicated that there was a problem with its engine and that this caused a sudden surge of pressure by the tug against the ship. Tr. 738:6-18, 773:22-774:5 (Colletti). The captain testified that he believed that the tug parted the first line, Tr. 549:11-19, (Captain Grosse), and so

---

[6] The plaintiff cites two other cases to support this argument, but neither involved the parting of mooring lines. *See Gibbs v. Kiesel*, 382 F.2d 917 (5th Cir. 1967); *Petterson v. Alaska S.S. Co.*, 205 F.2d 478 (9th Cir. 1953).

stated in the Corrective Action Report that he prepared. Tr. 561:5-16, 586:8-13 (Captain Grosse). In light of this testimony, the court properly denied the plaintiff's motion for a directed verdict and declined to alter the burden of proof in the jury instructions.

### B. The Jury's Understanding of "Equipment"

The plaintiff also objects to the unseaworthiness instruction on the basis that it did not specifically inform the jury that "equipment" includes mooring lines of The Liberty Sun and those connected to The Liberty Sun by third parties. The plaintiff's proposed jury instruction did not request any clarification to the jury that the word "equipment" included mooring lines. At the charging conference, however, the plaintiff for the first time requested that the court modify the standard jury instruction to specify that the seaworthiness inquiry applies not just to "equipment" but to "equipment, gear, or appurtenances" in order to clarify for the jury that mooring lines should be included. Tr. 1205:25-1206:21 (charging conference). The court declined to make any modification to the standard instruction and gave the jury the following instruction, derived from 5 Leonard B. Sand, Modern Federal Jury Instructions—Civil ¶ 90.04, Instr. 90-34:

> What is meant by unseaworthiness? The general maritime law, which applies in this case, imposes a duty on ship owners to provide vessels, equipment and crew which are reasonably fit for their intended use. If the vessel or its equipment or crew are not reasonably fit for their intended use, then the ship or that part of the ship or its equipment or crew is unseaworthy.

The court stated that the jury would reasonably understand from the extensive testimony in the case regarding the ship's use and operation of the mooring lines that they were part of the "equipment" referenced in the charge. The court also allowed the plaintiff to make this argument in closing – which he did without objection. *See* Tr. 1298:11-1299:5. Although in retrospect it may have been useful to add a brief clarification to the charge, there is no reasonable basis in the record for the conclusion that the jury did not understand the word "equipment" to include mooring lines.

-18-

The plaintiff also argues that the jury should have been instructed that the unseaworthiness inquiry includes equipment brought aboard by third parties.  After the jury was charged, the plaintiff raised this issue to the court at sidebar, citing a reference to third parties in his proposed negligence instruction as the basis for the objection.  *See* Tr. 1385:13-1386:12 (relying on Plaintiff's Proposed Jury Instructions, Dkt. No. 49, at 2-3).  There is no dispute that if the defective equipment temporarily brought on board by a third party caused the plaintiff's injuries, the defendants could be responsible.  *See Mitchell*, 362 U.S. at 549-50.  The defendants correctly point out, however, that the plaintiff's failure to propose this instruction or raise an objection to the unseaworthiness instruction prior to the jury being charged makes it untimely and unpreserved for review.  *See* Fed. R. Civ. P. 51(c).  Further, even if it was preserved, any error in the charge was harmless.  There was little made at trial as to whether it was the terminal's or The Liberty Sun's lines that parted.  And moreover, in summation the plaintiff's counsel argued without objection that "[i]t doesn't make a difference that it's somebody else's lines. Once it's on that vessel they're responsible. They have to make sure that everything's been inspected, that it's safe, it's seaworthy."  Tr. 1299:22-25.  Therefore, the plaintiff's motion for a new trial on the basis of errors in the unseaworthiness instruction is denied.

## CONCLUSION

In accordance with the above considerations, the plaintiff's post-trial motions are denied.

                                        **So Ordered.**

                                        *Viktor V. Pohorelsky*
                                        VIKTOR V. POHORELSKY
                                        United States Magistrate Judge

Dated:   Brooklyn, New York
            December 26, 2012